UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SIR-RAVEN R. RODGERS,

Plaintiff,

v.                                                    26-CV-802 (JLS)

DANIEL F. MARTUSCELLO,
*Commissioner New York State*
*Department of Corrections and*
*Community Supervision,*

Defendant.

---

## DECISION AND ORDER

*Pro se* Plaintiff Sir-Raven Rodgers filed this action seeking relief under 42 U.S.C. § 1983. Dkt. 1. He alleges his Eighth and First Amendment rights were violated while he was incarcerated at the Groveland Correctional Facility ("Groveland") during the New York State Department of Corrections and Community Supervision ("DOCCS") labor strike. *Id.* Rodgers was granted permission to proceed *in forma pauperis* ("IFP"). Dkt. 4.

By order dated June 10, 2026, the Court screened his amended complaint[1] pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a)-(b). Dkt. 6 ("initial screening order"). That order dismissed the complaint with leave to file an amended complaint against Martuscello in his individual capacity.

---

[1] Before the complaint was screened, Rodgers filed a motion for leave to file an amended complaint, Dkt. 3, which was granted. Dkt. 4.

Rodgers timely filed a second amended complaint (Dkt. 9).  The Court now screens the second amended complaint under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

For the reasons below, Rodgers's Eighth and First Amendment claims may proceed to service against Martuscello in his individual capacity.

<u>DISCUSSION</u>

## I.    LEGAL STANDARDS

A court shall dismiss a complaint in a civil action in which a prisoner seeks redress from a governmental entity, or an officer or employee of a governmental entity, if the court determines the action "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b)(1)-(2); *see* 28 U.S.C. § 1915(e)(2)(B) (setting forth the same criteria for dismissal).

Generally, the Court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (quoting *Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999)).  Permission to amend, however, "is not required where the plaintiff has already been afforded the opportunity to amend." *Bivona v. McLean*, No. 9-19-CV-0303 (MAD) (TWD), 2019 WL 2250553, at *5 (N.D.N.Y. May 24, 2019) (citing cases); *Cancel v. New York City Hum. Res. Admin./Dep't of Soc. Servs.*, 527 F. App'x 42, 44 (2d Cir. 2013) (summary order)

2

("[T]he district court had already permitted [the plaintiff] to amend his complaint once, and nothing in his amended complaint suggested that he would be able to state a valid . . . claim if he were granted leave to amend a second time. Therefore, granting [the Plaintiff] leave to amend his amended complaint as to these claims would have been futile."); *Cato v. Zweller*, No. 6:21-CV-6207 EAW, 2023 WL 8653857, at *2 (W.D.N.Y. Dec. 14, 2023) (dismissing the amended complaint with prejudice because it "does not remedy any of the pleading deficiencies identified in the Screening Order").

## II.    ALLEGATIONS

Liberally read, the allegations in the second amended complaint largely match those asserted in the amended complaint arising from Rodgers's confinement at Groveland.

Rodgers was housed in Groveland during the DOCCS labor strike. Dkt. 9 at 6. From February 17 through March 8, 2025, "[a]ll of the employees in [Groveland] intentionally participated in a[n] illegal labor strike." *Id.*

Martuscello, as DOCCS Commissioner, "has direct control and supervision of all operations at Groveland" and "intentionally failed to properly train and supervise the employees" there, "resulting in a[n] illegal and intentional labor strike that he knew would violate [Rodgers's] rights and place the safety of [his] mental and physical health in danger." *Id.* at 6-7. Martuscello knew that the labor strike "would result in a staff shortage in the facility that would result in [Rodgers's] denial of: adequate exercise/recreation, adequate religious services, adequate

3

mental health services, adequate food portions, adequate family visitation, and adequate medical services." *Id.* at 7. There was "no logical or legitimate penological" interest in denying these services. *Id.*

Martuscello was "well aware" of Rodgers's "serious need for mental health services"—Rodgers was on "OMH medication"—and the issues that denying these services would cause. *Id.* Yet, Martuscello "intentionally did nothing to prevent the labor strike[.]" *Id.* Denial of mental health services, which Rodgers requested several times in writing, caused him "several mental breakdowns and mental anguish." *Id.*

Martuscello was also "aware" that Rodgers was a "Rastafarian with sincere religious beliefs who needed to practice his religion." *Id.* Martuscello knew that the strike would result in a denial of Rodgers's right to practice his religion but "intentionally did nothing to prevent" the strike. *Id.* Rodgers also unsuccessfully requested to practice his Rastafarian services several times in writing. *Id.*

Martuscello knew that Rodgers had a "serious need for medical attention"— Rodgers was on blood pressure medication and pain medication—that he requested several times in writing. *Id.* Denial of his medications and medical services resulted in extreme pain hindering his daily activities like walking and sleeping. *Id.*

Martuscello knew that Rodgers "had a serious need for proper food portions and nutritional value to stay healthy." *Id.* Martuscello did nothing to prevent the

4

strike that caused the mess hall to close down and food to be served in unsanitary conditions. *Id.*

Martuscello knew that Rodgers "had a need for daily exercise and daily recreation to stay healthy." *Id.* He knew that a strike "would result in [his] wrongful denial of daily exercise"—which Rodgers requested daily—and did nothing to prevent it. *Id.* Rodgers was not allowed any in-cell activities or indoor recreation. *Id.*

During the strike, Rodgers was denied all communication with his family, as visits were not allowed, phone privileges were restricted, and he was not offered any mailing materials. *Id.* Martuscello knew that these restrictions would cause Rodgers to suffer depression and mental anguish. *Id.*

Martuscello "acted deliberately indifferent" because he "knowingly did nothing to stop the illegal labor strike that resulted in the denial of [Rodgers's] rights." *Id.* Rodgers filed multiple grievances, complaints, and appeals within the facility and to the appropriate offices in Albany—presumably Martuscello's office. *Id.* at 9-10.

Martuscello is sued in his individual capacity. *Id.* at 3. Rodgers seeks monetary damages. *Id.* at 6.

## III.  ANALYSIS

### A.  Eighth Amendment Conditions of Confinement

As the initial screening order explained, Dkt. 6 at 6-7, the Eighth Amendment requires prison officials to "provide humane conditions of confinement"

by "ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care, and . . . [by] tak[ing] reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). The Constitution prohibits cruel and unusual punishment but "does not mandate comfortable prisons." *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981). "Rather, conditions of confinement may constitute cruel and unusual punishment only when they result in unquestioned and serious deprivations of basic human needs . . . which, alone or in combination, may deprive inmates of a minimal civilized measure of life's necessities." *Davidson v. Conway,* 318 F. Supp. 2d 60, 62-63 (W.D.N.Y. 2004) (quoting *Rhodes,* 452 U.S. at 347) (brackets omitted).

Moreover, "[r]estraints on an inmate do not violate the [Eighth] [A]mendment unless they are 'totally without penological justification,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain.'" *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984) (quoting *Rhodes,* 452 U.S. at 346). Discomfort and restrictive prison conditions "are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347; *see also Wilson v. Seiter,* 501 U.S. 294, 303 (1991) ("[A]ssuming the conduct is harmful enough to satisfy the objective component of an Eighth Amendment claim, whether it can be characterized as 'wanton' depends upon the constraints facing the [prison] official." (internal citation omitted)).

6

### 1.    <u>Recreation</u>

"[E]xercise is one of the basic human needs protected by the Eighth Amendment[.]" *Williams v. Goord ("Williams I")*, 111 F. Supp. 2d 280, 292 (first citing *Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996); and then citing *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985)).  However, not every deprivation of exercise amounts to a constitutional violation.  Rather, a plaintiff must show that he was denied all meaningful exercise for a substantial period of time. *See Davidson v. Coughlin*, 968 F. Supp. 121, 129 (S.D.N.Y. 1997).

Factors to consider in making this determination are: (1) the duration of the deprivation; (2) the extent of the deprivation; (3) the availability of other out-of-cell activities; (4) the opportunity for in-cell exercise; and (5) the justification for the deprivation. *See Williams I*, 111 F. Supp. 2d at 292.

The second amended complaint alleges that Rodgers was denied all daily exercise and recreation during the labor strike and that he was not allowed any in-cell activities or indoor recreation.  Dkt. 9 at 7.  It also alleges that Martuscello knew that the staff shortage caused by the strike would lead to the denial of exercise and recreation and that he sent letters of complaint to Martuscello. *Id.* at 7, 10.

At this early stage and based on a liberal reading of the second amended complaint, Rodgers's allegations are sufficient to state a colorable claim that may proceed to service against Martuscello.[2]

### 2. Food Portions

Under the Eighth Amendment, inmates are entitled to "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it." *O'Keefe v. Goord*, 77 F. App'x 42, 44 (2d Cir. 2003) (summary order) (quoting *Robles v. Coughlin*, 725 F.2d 12, 14 (2d Cir. 1983) (per curiam)). To constitute an Eighth Amendment violation, the deprivation must create a serious danger to the health of the inmate.

Rodgers alleges that he was denied proper nutritional food during the strike and was instead served food in unsanitary conditions. Dkt. 9 at 7. He also alleges that Martuscello knew that the staff shortage caused by the strike would lead to the denial of adequate food portions and that he sent letters of complaint to Martuscello. *Id.* at 7, 10.

---

[2] Permitting this or any claim to proceed to service does not immunize it from a dismissal or summary judgment motion. *See Jones v. Sullivan*, No. 9:19-CV-0025(BKS)(CFH), 2020 WL 5792989, at *5 (N.D.N.Y. Sept. 29, 2020) ("A court's initial screening under § 1915(e) and/or § 1915A does not preclude a later dismissal under Fed. R. Civ. P. 12(b)(6)." (citing *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 434-35 (N.D.N.Y. 2009)).

At this early stage and based on a liberal reading of the second amended complaint, Rodgers's allegations are sufficient to state a colorable claim that may proceed to service against Martuscello.

## B.  Eighth Amendment Denial of Medical Care

As the initial screening order explained, Dkt. 6 at 9-11, "in order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to his serious medical needs.'" *Collymore v. Myers,* 74 F.4th 22, 30 (2d Cir. 2023) (citation modified) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)).  Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104-05.  "The standard of deliberate indifference includes both subjective and objective components." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998).

The objective component requires a plaintiff to "show that, while he was incarcerated, he suffered from a medical condition that is, 'in objective terms, sufficiently serious.'" *Mallet v. N.Y. State Dep't of Corr. & Cmty. Supervision,* 126 F.4th 125, 132 (2d Cir. 2025) (quoting *Chance,* 143 F.3d at 702).  "Though there is no single metric" for establishing a "sufficiently serious" medical condition, it "refers to a condition of urgency that may result in degeneration or extreme pain, that significantly affects daily activities, or that involves chronic and substantial pain." *Id.* (citation modified).  On a spectrum, "[t]he condition need not be 'life-threatening'

or 'at the limit of human ability to bear,' but it must be more than simply 'uncomfortable and annoying.'" *Id.* (quoting *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003)).

The subjective component requires that a defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) (quoting *Farmer*, 511 U.S. at 837). A defendant's "'failure to alleviate a significant risk that he should have perceived but did not' does not meet this standard." *Id.* (quoting *Farmer*, 511 U.S. at 838).

Rodgers alleges that he was denied medical services—including his blood pressure medication and pain medication—during the strike, "resulting in extreme pain hindering daily activities such as walking and sleeping." Dkt. 7 at 7. He also alleges that Martuscello knew that the staff shortage caused by the strike would lead to the denial of adequate medical care and that he sent letters of complaint to Martuscello. *Id.* at 7, 10.

At this early stage and based on a liberal reading of the second amended complaint, Rodgers's allegations are sufficient to state a colorable claim that may proceed to service against Martuscello.

### C.    First Amendment Right to Association

As the initial screening order explained, Dkt. 6 at 11-12, although incarcerated individuals retain the right to associate with others, *see Roberts v.*

10

*United States Jaycees*, 468 U.S. 617-18 (1984), they do "not retain rights inconsistent with proper incarceration," *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). Consequently, visitations may "be subject to reasonable restrictions on the time, place and manner of visits[,]" but "the intentional or malicious deprivation of visitation to a prisoner, even on one occasion, could rise to the level of a constitutional violation." *Mills v. Fischer*, 497 F. App'x 114, 116 (2d Cir. 2012) (summary order).

"To state a claim that a restriction on a visitation privilege[ ] violated the First Amendment right to association, a plaintiff must allege facts sufficient to demonstrate that the challenged restriction bears no 'rational relation to legitimate penological interests.'" *Mclellan v. Chapdelaine*, No. 3:16-CV-2032 (VAB), 2017 WL 388804, at *6 (D. Conn. Jan. 27, 2017) (quoting *Overton*, 539 U.S. at 131-37), *adhered to on reconsideration*, 2017 WL 3841469 (D. Conn. Sept. 1, 2017). A plaintiff must also allege that alternative means of communication were unavailable. *See Overton*, 539 U.S. at 135 (restriction on visitation not unreasonable because inmates had alternative means of communication "with persons outside the prison by letter and telephone"); *Paul v. Capra*, No. 20-CV-5154 (NSR), 2022 WL 992845, at *7 (S.D.N.Y. Mar. 31, 2022) (finding that plaintiff failed to state a plausible First Amendment claim where "alternative means of communication" remained available).

Rodgers alleges, beyond being prohibited from having family visits, that he was denied all communication with his family including via phone and not provided

11

any mailing materials. Dkt. 9 at 7. He also alleges that Martuscello knew that the staff shortage caused by the strike would lead to the denial of family visitation and that he sent letters of complaint to Martuscello. *Id.* at 7, 10.

At this early stage and based on a liberal reading of the second amended complaint, Rodgers's allegations are sufficient to state a colorable claim that may proceed to service against Martuscello.

### D.    First Amendment Free Exercise of Religion

As the initial screening order explained, Dkt. 6 at 12-14, it is well-established that "the First Amendment affords inmates constitutional protection to practice their religion." *Barry v. Russo*, No. 22-CV-3835 (KMK), 2024 WL 965000, at \*7 (S.D.N.Y. Mar. 5, 2024) (citing, *inter alia, O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987)). "Because 'the free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires,' courts are not permitted to inquire into the centrality of a professed belief to the adherent's religion or to question its validity in determining whether a religious practice exists." *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) (alteration omitted) (quoting *Employment Div., Dep't of Human Res. of Oreg. v. Smith*, 494 U.S. 872, 886-87 (1990)). "For that reason, an individual claiming violation of free exercise rights under [Section] 1983 need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Kravitz v. Purcell*, 87 F.4th 111, 123 (2d Cir. 2023) (citation modified).

12

This standard applies equally "to a prison inmate alleging a violation of his free exercise rights under [Section] 1983." *Id.* But "[i]n the prison context . . . 'the right to free exercise of religion' is balanced against 'the interests of prison officials charged with complex duties arising from administration of the penal system.'" *Id.* at 127-28 (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). Consequently, to state a First Amendment free exercise claim, a prison inmate must allege that (1) "the practice asserted is religious in the person's scheme of beliefs" and "the belief is sincerely held"; (2) "the challenged practice of the prison officials infringes upon the religious belief"; and (3) "the challenged practice" does not further "legitimate penological objectives." *Id.* at 128 (alteration omitted) (quoting *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)).

"[T]here is no requirement to show that the governmental burden on religious beliefs was 'substantial.'" *Id.* at 127. Rather, "a plaintiff may carry the burden of proving a free exercise violation by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Id.* (citation modified).

Rodgers alleges that he, a Rastafarian, had a need to practice his religion including through Rastafarian services. Dkt. 9 at 7. He also alleges that Martuscello knew that the staff shortage caused by the strike would lead to the denial of adequate religious services and that he sent letters of complaint to Martuscello. *Id.* at 7, 10.

13

At this early stage and based on a liberal reading of the second amended complaint, Rodgers's allegations are sufficient to state a colorable claim that may proceed to service against Martuscello.

## CONCLUSION

For the reasons above, Rodgers's Eighth and First Amendment claims may proceed to service against Martuscello in his individual capacity.

## ORDER

IT HEREBY IS ORDERED that Rodgers's Eighth and First Amendment claims may proceed to service against Martuscello; and it is further

ORDERED that the Clerk of Court shall cause the United States Marshals Service to serve copies of the summons, the second amended complaint (Dkt. 9), and this Decision and Order upon Daniel F. Martuscello, Commissioner, 1220 Washington Avenue, Building 4, Albany, New York, 12226, without Rodgers's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in Rodgers's favor; and it is further

ORDERED that the Clerk of Court shall forward a copy of this Decision and Order and the second amended complaint by email to Christopher L. Boyd, Assistant Attorney General in Charge, Buffalo Regional Office, at Christopher.Boyd@ag.ny.gov; and it is further

ORDERED that, upon service, pursuant to 42 U.S.C. § 1997e(g)(2), Defendant shall answer or respond to the claims of the second amended complaint; and it is further

ORDERED that pursuant to Western District of New York Local Rule of Civil Procedure 5.2(d), Rodgers must immediately notify the Court in writing each time his address changes.  Failure to do so may result in dismissal of the action with prejudice.

SO ORDERED.

Dated:       July 28, 2026
             Buffalo, New York

_____
JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE